1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

REGGIE BREAUX,

                    Petitioner,

      vs.

A. HEDGPETH, Warden,

                    Respondent.

)
)
)
)
)
)
)
)
)
)
)
)

Case No. CV 07-6661-AHM (RNB)

REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE
JUDGE

17

18

19

20

     This Report and Recommendation is submitted to the Honorable A. Howard Matz, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 194 of the United States District Court for the Central District of California.

21

22

23

24

25

26

27

28

## PROCEEDINGS

     On October 15, 2007, petitioner lodged for filing a Petition for Writ of Habeas Corpus by a Person in State Custody ("Pet.") herein.  In accordance with the Court's Order Requiring Response to Petition and following three extensions of time, respondent filed a Motion to Dismiss on the ground that Ground Five of the Petition was unexhausted.  Based on its review of petitioner's California Supreme Court filings, the Court issued a Minute Order on February 20, 2008, wherein it advised

petitioner that it was inclined to agree with respondent that Ground Five of the Petition had not been fairly presented to the California Supreme Court. Accordingly, unless petitioner (a) convinced the Court otherwise, or (b) withdrew his claim and elected to go forward solely on his other four claims, the Court would be compelled to recommend dismissal of the Petition without prejudice as a "mixed petition."

On March 7, 2008, petitioner filed a document captioned, "Notice to Withdraw Ground Five and Electing to go Forward Solely on the Remainder Four Claims in the Petition for Writ of Habeas Corpus" ("Notice"). In a Minute Order issued on March 12, 2008, the Court denied the Motion to Dismiss as moot and ordered respondent to file an Answer on the merits directed solely to Grounds One through Four of the Petition. Following one extension of time, respondent filed an Answer to Petition ("Ans."), along with a supporting Memorandum of Points and Authorities ("Ans. Mem.") on May 23, 2008. Petitioner failed to file a reply within the allotted time. Nor did he request an extension of time to do so.

Thus, this matter now is ready for decision. For the reasons discussed hereafter, the Court recommends that the Petition be denied.

## PROCEDURAL HISTORY

On August 9, 2004, a Los Angeles County Superior Court jury found petitioner guilty of attempted willful, deliberate, and premeditated murder. (See Clerk's Transcript on Appeal ["CT"] 102-03; 2 Reporter's Transcript on Appeal ["RT"] 903-04). The jury also found true the enhancement allegation that in the commission of the attempted murder, petitioner had personally used and intentionally discharged a firearm within the meaning of Cal. Penal Code §§ 12022.53(a)-(c). (See CT 102-03; 2 RT 904). On September 9, 2004, the trial court sentenced petitioner to state prison for a term of thirty-two years to life. (See CT 110-11; 2 RT 1202-03).

Petitioner appealed his conviction and sentence to the California Court of Appeal raising one claim generally corresponding to (the now withdrawn) Ground

Five of the Petition herein. (<u>See</u> Respondent's Notice of Lodgment ["Lodgment"] No. 3). In an unpublished decision issued on September 14, 2005, the California Court of Appeal rejected petitioner's claim and affirmed the judgment, although it did order correction of the abstract of judgment. (<u>See</u> Lodgment No. 5). Petitioner did not petition the California Supreme Court for review of the Court of Appeal decision.

Petitioner's first collateral challenge to his conviction took the form of a Petition for Writ of Habeas Corpus filed in the Los Angeles County Superior Court on August 8, 2006, wherein petitioner alleged three claims generally corresponding to Grounds One, Two, and Three of the Petition herein. (<u>See</u> Lodgment No. 6). On February 7, 2007, petitioner filed a document in the Superior Court captioned a "Request for Order Granting Habeas Relief Pursuant to Habeas Rule 4.551(a)(3) and 4.551(d)," wherein he argued that he was entitled to habeas relief in light of the Superior Court's failure to rule on the (August 2006) petition or issue an order to show cause within 30 days and the respondent's failure to deny any of the allegations set forth therein. (<u>See</u> Lodgment No. 8). On February 20, 2007, the Superior Court issued an order denying petitioner's "Request for Order Granting Habeas Relief" on the ground that petitioner's three claims should have been raised on direct appeal. (<u>See</u> Lodgment No. 9). Subsequently, on March 21, 2007, the Superior Court issued a separate minute order denying petitioner's habeas petition "for not having any merit." (<u>See</u> <u>id.</u>).

On April 12, 2007, petitioner filed a habeas petition in the California Court of Appeal wherein he raised claims generally corresponding to the claims originally alleged in the Petition herein. (<u>See</u> Lodgment No. 10). The Court of Appeal summarily denied that petition on April 19, 2007 without citation of authority. (<u>See</u> Lodgment No. 11). Petitioner then filed a Petition for Writ of Mandate in the California Court of Appeal wherein he sought an order directing the Superior Court to vacate its denial of petitioner's habeas petition and to require respondent to file a return to that petition. (<u>See</u> Lodgment No. 12). On April 23, 2007, the Court of

3

Appeal issued an order summarily denying the writ of mandate petition without citation of authority.  (See Lodgment No. 13).

Next, petitioner filed a habeas petition in the California Supreme Court on May 10, 2007, wherein he raised claims generally corresponding to Grounds One through Four and partially corresponding to (the now withdrawn) Ground Five of the Petition herein.  (See Lodgment No. 17).  The Supreme Court denied that petition on September 19, 2007 with citations to In re Dixon, 41 Cal. 2d 756 (1953)[1] and People v. Duvall, 9 Cal. 4th 464, 474 (1995).[2]  (See Lodgment No. 18).  In the meantime, on July 5, 2007, petitioner had filed a Petition for Writ of Mandate in the California Supreme Court wherein he sought the same order directed to the Superior Court as he had sought in his Court of Appeal writ of mandate petition.  On July 26, 2007, the California Supreme Court transferred the matter to the Court of Appeal for consideration in light of Hagan v. Superior Court, 57 Cal. 2d 767 (1962).[3]  (See Lodgment No. 15).  The California Court of Appeal proceeded to deny the petition on August 2, 2007, stating in its order that it had reviewed the files in the two

---

[1]     In La Crosse v. Kernan, 244 F.3d 702, 705 (9th Cir. 2001), the Ninth Circuit observed that "[t]he Dixon rule bars California state courts from granting habeas relief to a prisoner who failed to pursue the claims raised in his habeas petition on direct appeal from his conviction, unless his claims fall within an exception to the rule."

[2]     In King v. Roe, 340 F.3d 821, 823 (9th Cir. 2003), the Ninth Circuit construed a citation to Duvall by the California Supreme Court as signifying that the claims had not been presented with sufficient particularity.

[3]     Hagan stands for several propositions, including the proposition that, "in the orderly administration of justice, and in support of a sound judicial policy, a court, in the absence of unusual or changed circumstances, . . . is justified, in its discretion, in refusing to consider repetitive applications of the same petition."  See Hagan, 52 Cal. 2d at 770-71.

prior petitions filed by petitioner and citing <u>Hagan</u>.   (<u>See</u> Lodgment No. 16). Petitioner then petitioned the California Supreme Court for review of the Court of Appeal's August 2, 2007 decision.  (<u>See</u> Lodgment No. 19).  The California Supreme Court summarily denied that Petition for Review on October 10, 2007 without comment or citation of authority.  (<u>See</u> Lodgment No. 20).

The filing of the instant Petition followed on October 15, 2007.

## SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL

Since petitioner is not challenging the sufficiency of the evidence to support his conviction, the following summary is taken from the "Factual and Procedural Background" section of the California Court of Appeal opinion (Lodgment No. 5 at 2-4):

*1.   The Shooting*

*Larisha Hunter was a tenant at the Park Village Apartments, located in a neighborhood claimed by the Park Village Crips.  She had a disagreement with [petitioner], a known gang member, involving a parking space in the apartment complex, where he and other gang members had gathered.  The argument escalated when Hunter telephoned her father for help.  [Petitioner] and two of his confederates each displayed guns; petitioner then cocked and pointed his gun at Hunter, repeatedly identified himself as "Park Village Crips" and threatened to shoot her. The confrontation ended when [petitioner's] girlfriend pushed him into her car and drove away with [petitioner] and his confederates.*

*Hunter's father, Andre Hill Bey, arrived at the complex in response to Hunter's telephone call.  He was carrying a gun and yelling for the person who had threatened his daughter.  Hunter identified the person as "Little Regg" or "Little Reggie"; Hill Bey said he did not know him.  Hill Bey then saw two men he thought were Park Village Crips gang members and told them, "You let whoever this guy is know that I'm looking for him."   Hill Bey also shouted that whatever group had accosted his*

5

1   *daughter should direct its attention to him.  Realizing he had just issued a challenge,*
2   *Hill Bey had his daughter immediately leave her apartment.*

3       *Two weeks later, Hill Bey was back at the apartment complex when he saw*
4   *[petitioner] and greeted him in passing.  When Hill Bey subsequently drove out of the*
5   *complex, he noticed [petitioner] near the exit gate.  Hill Bey looked away, heard and*
6   *felt gun shots and, after turning, saw [petitioner] shooting at him.  [Petitioner] fled.*
7   *Hill Bey was hospitalized with three gunshot wounds.*

8       *The following day Hill Bey, an illustrator, drew a picture of the shooter and*
9   *showed it to Hunter.  Hunter testified at trial that the person depicted in the picture*
10   *drawn by her father looked like [petitioner].  Hill Bey identified [petitioner] as the*
11   *shooter in a police photographic lineup and in court.*

13       *2. The Gang Expert Testimony*

14       *Defense counsel moved in limine to exclude all gang evidence, arguing the*
15   *offense resulted from a personal dispute, unconnected to [petitioner's] purported gang*
16   *affiliation, and the evidence was irrelevant in the absence of a gang enhancement*
17   *allegation.  After considering the prosecutor's proffered evidence, the trial court*
18   *deferred ruling, but indicated that, if admitted at all, the evidence would be permitted*
19   *only for the limited purpose of proving motive and identity.*

20       *At a subsequent hearing pursuant to Evidence Code section 402, Los Angeles*
21   *County Sheriff's Detective Peter Hecht  testified as both the investigating officer and*
22   *an expert on the Park Village Crips.  At the conclusion of the hearing the trial court*
23   *found the evidence of [petitioner's] gang membership relevant to show motive and*
24   *identity and concluded its probative value outweighed any undue prejudice.  However,*
25   *limiting the scope of the permissible testimony, the court ruled Hunter could testify*
26   *only that the individuals in the parking lot were affiliated with a gang and that she*
27   *gave her father the name of one of those individuals.  The court further ruled*
28   *Detective Hecht qualified as a gang expert and could testify as to the gang's*

1  *"mentality," operations, and response to a perceived showing of disrespect.*

2  *At trial Detective Hecht testified the Park Village Crips is a Compton gang that*
3  *takes its name from the Park Village Apartment Complex where many gang members*
4  *reside. [Petitioner] was a self-admitted Park Village Crip, and his gang moniker was*
5  *"Little Regg."   Other Park Village Crips had identified [petitioner] to Detective*
6  *Hecht as a fellow gang member.*

7  *Detective Hecht opined the shooting of Hill Bey was gang-related. He explained*
8  *the importance of respect to gang members, which they achieve through violence.  If*
9  *a gang or an individual member is challenged, retaliation is required to ensure the*
10  *gang and gang member retain respect in the community.  Gang members often work*
11  *together; one or more may commit the retaliatory act, using another gang member's*
12  *gun before it is handed off to yet another gang member.  By confronting gang*
13  *members with a gun, Hill Bey issued a challenge to the Park Village Crips gang and*
14  *its individual members.  His showing of disrespect would have called for immediate*
15  *retaliation by the gang.*

16

17  **PETITIONER'S CLAIMS**

18  1.    Petitioner was denied his Sixth Amendment right to be tried by a fair and
19  impartial jury.  (See Pet. at 5, 5.1-5.5).

20  2.    The trial court deprived petitioner of his Fourteenth Amendment right to
21  a fair trial when the court admitted irrelevant evidence of petitioner's prior bad act.
22  (See Pet. at 5, 5.6-5.10).

23  3.    The trial court deprived petitioner of his Sixth Amendment right to the
24  effective assistance of counsel and his Fifth and Fourteenth Amendment due process
25  right when it failed to conduct a Marsden hearing.  (See Pet. at 6, 6.1-6.5).

26  4.    Petitioner was denied his state and federal constitutional due process and
27  equal protection rights when his appellate counsel failed and refused to provide the
28  quality of representation the rich receive and the Constitution demands.  (See Pet. at

7

6, 6.6-6.13).

5.    [Withdrawn.]

## STANDARD OF REVIEW

The standard of review applicable to petitioner's claims herein is set forth in 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

> "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings."

Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000); see also Carey v. Musladin, 549 U.S. 70, 127 S. Ct. 649, 653, 166 L. Ed. 2d 482 (2006); Smith v. Patrick, 508 F.3d 1256, 1260 (9th Cir. 2007).

Although a particular state court decision may be both "contrary to" and "an unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings. See Williams, 529 U.S. at 391, 413. A state court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the

1   result the Supreme Court reached on "materially indistinguishable" facts. <u>See</u> <u>Early</u>

2   <u>v. Packer</u>, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (per curiam);

3   <u>Williams</u>, 529 U.S. at 405-06.  When a state court decision adjudicating a claim is

4   contrary to controlling Supreme Court law, the reviewing federal habeas court is

5   "unconstrained by § 2254(d)(1)."  <u>Williams</u>, 529 U.S. at 406.  However, the state

6   court need not cite or even be aware of the controlling Supreme Court cases, "so long

7   as neither the reasoning nor the result of the state-court decision contradicts them."

8   <u>Early</u>, 537 U.S. at 8.

9          State court decisions that are not "contrary to" Supreme Court law may only be

10   set aside on federal habeas review "if they are not merely erroneous, but 'an

11   <u>unreasonable</u> application' of clearly established federal law, or are based on 'an

12   <u>unreasonable</u> determination of the facts.'"  <u>Early</u>, 537 U.S. at 11 (citing 28 U.S.C.

13   § 2254(d) and adding emphasis).  A state court decision that correctly identified the

14   governing legal rule may be rejected if it unreasonably applied the rule to the facts of

15   a particular case.  <u>See</u> <u>Williams</u>, 529 U.S. at 406-10, 413 (<u>e.g.</u>, the rejected decision

16   may state <u>Strickland</u> rule correctly but apply it unreasonably); <u>Woodford v. Visciotti</u>,

17   537 U.S. 19, 24-27, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002) (per curiam).  However,

18   to obtain federal habeas relief for such an "unreasonable application," a petitioner

19   must show that the state court's application of Supreme Court law was "objectively

20   unreasonable."  <u>Visciotti</u>, 537 U.S. at 24-27; <u>Williams</u>, 529 U.S. at 413.  An

21   "unreasonable application" is different from an erroneous or incorrect one.  <u>See</u>

22   <u>Williams</u>, 529 U.S. at 409-10; <u>see also</u> <u>Visciotti</u>, 537 U.S. at 25; <u>Bell v. Cone</u>, 535

23   U.S. 685, 699, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002).

24          The Ninth Circuit has held that "when no reasoned state court decision denying

25   a habeas petition exists, the federal court should "perform an 'independent review of

26   the record' to ascertain whether the state court decision was objectively

27   unreasonable."  <u>See</u> <u>Pham v. Terhune</u>, 400 F.3d 740, 742 (9th Cir. 2005); <u>Little v.</u>

28   <u>Crawford</u>, 449 F.3d 1075, 1079 (9th Cir. 2006); <u>Himes v. Thompson</u>, 336 F.3d 848,

1   853 (9th Cir. 2003).  Independent review is not the equivalent of de novo review, "but

2   rather is a style of review which views the state court decision "through the

3   'objectively reasonable' lens ground by Williams."  Allen v. Ornoski, 435 F.3d 946,

4   955 (9th Cir.), cert. denied, 546 U.S. 1136 (2006).  Although the federal habeas court

5   independently reviews the record, it must "still defer to the state court's ultimate

6   decision."  Id.

7

8                                        **DISCUSSION**

9          Preliminarily, the Court will address respondent's contention that Grounds One

10  through Four of the Petition are procedurally defaulted due to the California Supreme

11  Court's citation of In re Dixon, 41 Cal. 2d 756 in its September 19, 2007 order

12  denying petitioner's habeas petition.  According to respondent, the Dixon citation

13  "signified that the claims were procedurally barred by Petitioner's failure to raise them

14  on direct appeal." (See Ans. Mem. at 12).  However, respondent has failed to explain

15  how the Dixon citation could possibly be construed as applying to petitioner's claim

16  relating to the quality of the representation provided by his appellate counsel.  The

17  Court therefore will presume that the issue here is whether Grounds One, Two, and

18  Three of the Petition are procedurally defaulted.

19         In order for a claim to be procedurally defaulted for federal habeas corpus

20  purposes, "the application of the state procedural rule must provide 'an adequate and

21  independent state law basis' on which the state court can deny relief."  Park v.

22  California, 202 F.3d 1146, 1151 (9th Cir.), cert. denied, 531 U.S. 918 (2000).  "For

23  a state procedural rule to be 'independent,' the state law basis for the decision must

24  not be interwoven with federal law."  La Crosse v. Kernan, 244 F.3d 702, 704 (9th

25  Cir. 2001); Morales v. Calderon, 85 F.3d 1387, 1393 (9th Cir.) ("Federal habeas

26  review is not barred if the state decision 'fairly appears to rest primarily on federal

27  law, or to be interwoven with the federal law.'"), cert. denied, 519 U.S. 100 (1996).

28  In order for a state procedural bar to be "adequate," the state courts must employ a

                                              10

1  "firmly established and regularly followed state practice." <u>Ford v. Georgia</u>, 498 U.S.

2  411, 423-24, 111 S. Ct. 850, 112 L. Ed. 2d 935 (1991).  In <u>Bennett v. Mueller</u>, 322

3  F.3d 573, 586 (9th Cir.), <u>cert.</u> <u>denied</u>, 540 U.S. 938 (2003), the Ninth Circuit held that,

4  "once the state has adequately pled the existence of an independent and adequate state

5  procedural ground as an affirmative defense, the burden to place that defense in issue

6  shifts to the petitioner."  The Ninth Circuit observed that a petitioner could satisfy this

7  burden "by asserting specific factual allegations that demonstrate the inadequacy of

8  the state procedure, including citation to authority demonstrating inconsistent

9  application of the rule."  <u>Id.</u>

10       However, even assuming that respondent has adequately pled the existence of

11  an independent and adequate state procedural ground and that petitioner has not

12  satisfied his burden of placing the procedural default defense in issue, habeas review

13  of Grounds One, Two, and Three of the Petition will not be barred if petitioner can

14  demonstrate cause for his procedural default and actual prejudice as a result of the

15  alleged violation of federal law.  <u>See</u> <u>Coleman v. Thompson</u>, 501 U.S. 722, 750, 111

16  S. Ct. 2546, 115 L. Ed. 2d 640 (1991); <u>Bennett</u>, 322 F.3d at 580; <u>Park</u>, 202 F.3d at

17  1150.  To satisfy his burden of demonstrating "cause" for the procedural default,

18  petitioner must show "that some objective factor external to the defense impeded

19  counsel's efforts to comply with the State's procedural rule." <u>Murray v. Carrier</u>, 477

20  U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986).  Here, the Court construes

21  Ground Four of the Petition as encompassing a claim that the failure to raise Grounds

22  One, Two, and Three on direct review was due to ineffective assistance of appellate

23  counsel.  (<u>See</u> Pet. at 6.6-6.13).  In <u>Murray</u>, the Supreme Court did state that

24  "constitutionally ineffective assistance of counsel . . . is cause for a procedural

25  default." <u>Murray</u>, 477 U.S. at 488; <u>see</u> <u>also</u> <u>Bonin v. Calderon</u>, 77 F.3d 1155, 1158

26  (9th Cir.), <u>cert.</u> <u>denied</u>, 516 U.S. 1143 (1996).  However, the Supreme Court also

27  stated that "[a]ttorney error short of ineffective assistance of counsel does not

28  constitute cause for a procedural default." <u>Murray</u>, 477 U.S. at 492; <u>see</u> <u>also</u> <u>Bonin</u>,

11

1    77 F.3d at 1158 ("counsel's ineffectiveness will constitute cause only if it amounts to
2    an 'independent constitutional violation'").  The Supreme Court also stated that a
3    claim of ineffective assistance of counsel must be presented to the state courts as an
4    independent claim before it may be used to establish cause for a procedural default.
5    See Murray, 477 U.S. at 489.  Here, it appears that petitioner did raise his ineffective
6    assistance of appellate counsel claim as an independent claim in his California
7    Supreme Court habeas petition.  (See Lodgment No. 17).

8           However, the Court has concluded in the interests of judicial economy that it
9    is unnecessary for the Court to determine whether the Dixon rule constitutes an
10   independent and adequate state procedural ground or whether petitioner has made the
11   requisite showings of "cause" and "prejudice" to overcome his alleged procedural
12   default with respect to Grounds One, Two, and Three of the Petition because even if
13   those claims are considered on their merits, habeas relief still is not warranted.  See
14   Lambrix v. Singletary, 520 U.S. 518, 525, 117 S. Ct. 1517, 137 L. Ed. 2d 771 (1997)
15   (noting that, in the interest of judicial economy, courts might resolve easier matters
16   where complicated procedural default issues exist).

17

18   **A.    Habeas relief is not warranted with respect to petitioner's first ground for**
19          **relief.**

20          1.    The record below

21                a.    Juror No. 7

22          During a sidebar following Hill Bey's testimony, Juror No. 7 informed the trial
23   court that she recognized Hill Bey from the Bally's gym where they would say hello
24   "now and then" but did not talk personally.  She knew his name was Andre but did not
25   know his last name, so when she first saw him she knew it was "Andre at the gym."
26   In response to the court's inquiry, she stated that she came into contact with the
27   witness four to five times a week but just said hello.  She indicated that sometimes
28   Hill Bey would inquire how her workout was and she would respond "good," but that

12

was it.  (See 1 RT 471-72).  When asked whether she had ever socialized with him or sat down and talked to him for more than a few seconds, she responded "No."  (See 1 RT 473).  The following exchange then took place:

> [The prosecutor]:  Is there anything about your knowing him that's going to affect how you deliberate in this case?
>
> Juror No. 7:  I don't think so.
>
> [The prosecutor]:  Are you able to be fair and apply the same standard to Andre [Hill Bey] as you did to all the other witnesses?
>
> Juror No. 7:  Yes.
>
> [Defense counsel]: You don't have any bad feelings towards him?
>
> Juror No. 7:  No.
>
> [Defense counsel]:  He's always been cordial to you?
>
> Juror No. 7:  Yes.
>
> [Defense counsel]: He's someone you would talk to on the outside that you really don't know?
>
> Juror No. 7:  If I'm approached, yeah.
>
> The Court:  Now, you indicated, just so that we're clear, you don't think adversely of him, is that correct?
>
> Juror No. 7:  Adversely, no.
>
> The Court:  You don't think badly of him?
>
> Juror No. 7:  No.
>
> The Court:  And conversely you don't think highly of him per say [sic]?
>
> Juror No. 7:  No.
>
> The court:  Just somebody that you happen to come in contact with, happen to know?
>
> Juror No. 7: Correct.  (See 1 RT 473-74).

1    The Court clarified that the juror's relationship with Hill Bey was limited to

2    having a common interest in working out, coming into contact with him at the gym,

3    and saying hi or waving during workouts. (See 1 RT 474).

4    After Juror No. 7 left the sidebar, the prosecutor stated he thought she [Juror

5    No. 7] was "fine"; "she was very fair" and Hill Bey was "someone she ha[d] passing

6    knowledge of." Defense counsel asked that Juror No. 7 be excused for cause "for

7    knowing him, for speaking to him on a regular basis . . .." Defense counsel argued

8    that it was prejudicial to petitioner for her to remain on the jury. He maintained that

9    when you come into contact with people on a regular basis, you think nice things of

10   them and that you will not speak to people who you don't think highly of. (See 1 RT

11   474). The trial court indicated that a decision did not need to be made immediately

12   and that it would look at the issue and any authority counsel provided. The court

13   indicated, though, that preliminarily, it did not think Juror No. 7 needed to be excused

14   because of the casual contact over a period of time that did not develop into a personal

15   relationship. (See 1 RT 475-76).

16

17                  b.      Juror No. 12

18   At a sidebar during the testimony of Sonia Sonju, the court advised counsel that

19   Juror No. 12 had advised the clerk that she knew Sonju. Before the court and counsel

20   at sidebar, Sonju indicated that when she lived in a Seal Beach Trailer Park, Sonju

21   became the wife of the owner of the trailer park. Juror No. 12 did not recognize

22   Sonju's face immediately, but when Sonju began referring to her husband on the

23   stand, Juror No. 12 realized who it was. Juror No. 12 stated that Sonju's husband

24   ("Dawson") had died, and that it had been about 18 years since her last contact with

25   the Dawsons. When she heard "Sunny" (Sonju) and remembered reading about a

26   complex she (Sonju) and her husband were building in Compton, she had a feeling it

27   must be her. The only contact Juror No. 12 had with Sonju was before the juror was

28   married. (See 1 RT 481-82). She had once done work with one of the friends of the

14

Dawsons and had slept at Sonju's house.  The court then inquired:

> *The Court:  Here's the bottom line: First of all, your only relationship was basically as a tenant of properties owned by her?*
>
> *Juror No. 12: And that one night, spending the night at her house.*
>
> *The Court: Is that relationship going to affect your ability to fairly evaluate all of the evidence in this case?*
>
> *Juror No. 12: I don't think so, but there's something in the back of my head about – what's the word – some kind of problem that she might have caused – I don't know.*
>
> *The Court: Problem when?  20 years ago?*
>
> *Juror No. 12: Yeah, I guess, you know, about.*
>
> *The Court: Well, her testimony here today has nothing to do with the murder, per say [sic].  She's testified as to certain facts.  Do you think you're –*
>
> *Juror No. 12: Questions about the money thing and affecting her daughter is not – Cathy is the daughter's name?  Because that's his daughter's name.  It's a family thing, but that kind of thing may make me start saying I think I better share this, because –* (<u>See</u> 1 RT 483-84).

At this point, the trial court indicated that each attorney would have an opportunity to elicit information that bore on the credibility of the witness, but that the only question here was whether her past contact with the witness was going to effect her ability to fairly evaluate the credibility of the witness.  However, neither the prosecutor nor defense counsel had any questions for the juror.  (<u>See</u> 1 RT 484-85).

## c.    <u>The trial court's ruling on juror bias</u>

The following day, the court revisited the issue of the two jurors.  The prosecutor indicated that he had done some preliminary research and had concluded

1  that they did not have grounds for dismissing either juror.  The prosecutor maintained

2  that both jurors had indicated they could be fair and their relationships with the

3  witnesses were minor.  Defense counsel argued that Juror No. 7 would feel badly if

4  she voted not guilty given her acquaintance with Hill Bey, whom she recognized from

5  the back of the head.  With respect to Juror No. 12, defense counsel maintained that

6  she indicated that she did not think highly of Sonju and that this was prejudicial.

7  Defense counsel requested that both jurors be excused.  Both counsel submitted.  (See

8  2 RT 613-15).

9       The trial court indicated that it had conducted its own research and did not find

10 anything that would require the court to dismiss the jurors as a matter of law.  It then

11 made the following findings with respect to Juror No. 7: she did not recognize Mr.

12 Hill Bey's name when it was read into the record prior to jury selection; she only

13 knew the man as "Andre"; it was not until he took the stand or shortly before that she

14 recognized him as the individual she had come into contact with at Bally's; it was

15 reasonably clear that she was cordial with him and they waved at each other; and they

16 had no relationship beyond that.  (See 2 RT 615-16).  The trial court found that with

17 respect to bias giving rise to cause to dismiss a juror, bias is defined as "a state of

18 mind on the part of the jurors in reference to the case or to any of the parties which

19 will prevent the juror from acting with entire impartiality and without prejudice to the

20 substantial rights of any party."  (See 2 RT 616-17).  With respect to Juror No. 7, the

21 trial court noted that it had inquired of her whether her contact with Hill Bey would

22 affect her ability to be an independent evaluator of the credibility of the witnesses and

23 she had responded "no."  As to Juror No. 7, the trial court found that her casual

24 contact with Hill Bey did not "rise[] to that level" of bias giving rise to cause to

25 dismiss her.  (See 2 RT 616-17).

26      With respect to Juror No. 12, the trial court found that she also did not

27 recognize the names read to her prior to jury selection; it took her a period of time to

28 recognize that she may have known Sonju from her past; she did not recognize her

16

1    face; she only recognized her when she started talking about a business relationship;
2    she knew Sonju from 20 years ago when she (Juror No. 12) was a tenant in a trailer
3    park where Sonju and her husband had an interest; and she had peripheral information
4    regarding Sonju and her husband developing another property in Compton. (See 2 RT
5    617-18).  The trial court noted that the only question was whether the juror could
6    independently evaluate the credibility of the witness and evidence and reach a just
7    decision, and the court recalled that she indicated she could be independent.  As with
8    Juror No. 7, both counsel were given an opportunity to inquire of the juror. (See 2 RT
9    618).

10          The trial court found that each of the jurors could independently evaluate the
11   evidence and not be prejudicial toward either party.  The trial court then denied the
12   request to excuse the two jurors.  (See 2 RT 618-19).

13

14          2.    Petitioner's claim

15          Petitioner contends that the trial court curtailed a thorough hearing into the
16   biases or prejudices of Jurors No. 7 and 12, resulting in a violation of his due process
17   and fair and impartial jury rights.  (See Pet. at 5.5).  Citing California law, he
18   maintains that "[o]nce a jurors [sic] impartiality is at issue, a hearing must be held to
19   decide whether to dismiss the jurors.  (See id.).

20

21          3.    Analysis[4]

22          _____

23          [4]    To the extent that petitioner is relying on California law for the
24   proposition that he was entitled to a hearing on the issue of the jurors' alleged bias,
     any non-compliance by the trial court with the requirements of the state law do not
25   give rise to a cognizable claim on federal habeas review.  See 28 U.S.C. § 2254(a);
26   Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991)
     (reiterating that it is not the province of a federal habeas court to reexamine state court
27   determinations on state law questions); Smith v. Phillips, 455 U.S. 209, 221, 102 S.
28                                                                          (continued...)

                                          17

A criminal defendant has a Sixth Amendment right to a "fair trial by a panel of impartial, 'indifferent' jurors." Irwin v. Dowd, 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961); Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir.), cert. denied, 525 U.S. 1033 (1998). If only one juror is unduly biased or prejudiced or improperly influenced, the criminal defendant is denied his Sixth Amendment right to an impartial panel. The Supreme Court has held that the remedy for allegations of jury misconduct or juror bias is a hearing, in which the trial court determines the circumstances of what transpired, the impact on the jurors, and whether or not it was prejudicial. See Remmer v. United States, 347 U.S. 227, 229-30, 74 S. Ct. 450, 98 L. Ed. 654 (1954); Smith v. Phillips, 455 U.S. 209, 216-17, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982). However, the Ninth Circuit has not construed these cases as mandating that an evidentiary hearing be held every time there is an allegation of jury misconduct or bias. Rather, the decision to conduct a hearing into alleged jury misconduct or bias and to determine its extent and nature is within the trial court's discretion. See, e.g., United States v. Berry, 627 F.2d 193, 197 (9th Cir. 1980), cert. denied, 449 U.S. 1113 (1981); United States v. Hendrix, 549 F.2d 1225, 1227 (9th Cir.), cert. denied, 434 U.S. 818 (1977); see also Sims v. Rowland, 414 F.3d 1148, 1153 (9th Cir.) (state court's failure to hold an evidentiary hearing sua sponte when presented with evidence of juror bias is not contrary to and does not involve an unreasonable application of clearly established Supreme Court law), cert. denied, 546 U.S. 1066 (2005). Under federal law, a court deciding whether to conduct a hearing "must consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source." United States v. Angulo, 4 F.3d 843, 847 (9th Cir. 1993).

For the reasons set forth below, the Court has no basis for finding or concluding

---

[4](...continued)
Ct. 940, 71 L. Ed. 2d 78 (1982) ("A federally issued writ of habeas corpus, of course, reaches only convictions obtained in violation of some provision of the United States Constitution.").

1  that the California courts' rejection of this claim was based on an unreasonable

2  determination of the facts in light of the evidence presented in the state court

3  proceedings.  Nor does the Court have any basis for finding or concluding that the

4  California courts' rejection of this claim either was contrary to or involved an

5  unreasonable application of clearly established Supreme Court law.

6

7              a.    Juror No. 7

8          Initially, the Court notes that petitioner's contention regarding the curtailing of

9  a "thorough hearing" that allegedly occurred with respect to Juror No. 7 ostensibly

10  relates to the court's failure to inquire of Juror No. 7 regarding a separate encounter

11  that she supposedly had had with Hill Bey at a night club during the trial.  (See Pet.

12  at 5.1 (citing 2 RT 725)).  However, petitioner's characterization of the record is

13  inaccurate.  After the trial court denied defense counsel's motion to excuse the jurors,

14  at the request of the prosecutor, the trial court agreed to admonish Jurors No. 7 and 12,

15  individually, that they were not to discuss their respective "relationships" with the

16  witnesses with the other jurors.  (See 2 RT 619).  At the point at which the trial court

17  summoned Juror No. 7 for this purpose, the court stated:

18              "I just want to tell you something, and keep it in mind.  You

19          indicated to us that you had seen Mr. Hill Bey at the club, and I'm going

20          to instruct you that until such time as this case is over not to mention that

21          to any other jurors, if they should ask you why you went back or

22          whatever.  They don't need to know whether or not you've had any prior

23          contact.  Do you understand that?"  (See 2 RT 725).

24

25  Juror No. 7 responded, "yes" and was excused.  The record does not indicate that

26  Juror No. 7 had any contact with Hill Bey at a night club during the trial and it is

27  reasonable to assume from the context of the above quoted exchange that by "club,"

28  the trial court actually was referring to the gym where Juror No. 7 had seen Hill Bey.

1        In any event, the trial court <u>did</u> inquire, during the side-bar hearing, of Juror No.

2 7 regarding her contact with Hill Bey, the depth of her "relationship" with him, and

3 whether her contact with him would affect her ability to be fair and impartial.  Juror

4 No. 7 responded that she did not think badly of or highly of Hill Bey and that she

5 could be fair and impartial in judging Hill Bey as a witness and in deliberating.  (<u>See</u>

6 1 RT 473-74).  The trial court then made the findings that Juror No. 7's casual contact

7 with Hill Bey did not "rise[] to that level" of bias giving rise to cause to dismiss her,

8 and that she could independently review the evidence and not be prejudicial to either

9 party.  A trial judge's finding that a particular juror was not biased has been regarded

10 as a factual finding subject to the statutory presumption of correctness, because

11 "resolution [of the juror impartiality issue] depends heavily on the trial court's

12 appraisal of witness credibility and demeanor."  <u>See</u>, <u>e.g.</u>, <u>Thompson v. Keohane</u>, 516

13 U.S. 99, 111, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995); <u>Wainwright v. Witt</u>, 469 U.S.

14 412, 428-29, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985); <u>Patton v. Yount</u>, 467 U.S. 1025,

15 1038, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984).  Here, petitioner has not even

16 purported to meet his burden of adducing clear and convincing evidence to overcome

17 this presumption.  <u>See</u> 28 U.S.C. § 2254(e)(1).

18

19                        b.   <u>Juror No. 12</u>

20        With respect to Juror No. 12, petitioner's characterization of the record also is

21 inaccurate.  As with Juror No. 7, the Court held a sidebar to inquire into the nature and

22 extent of Juror No. 12's contact with Sonju.  Contrary to petitioner's contention, Juror

23 No. 12 did not "inform[] the Court that she was aware of information destroying

24 witness Sonju's credibility."  (<u>See</u> Pet. at 5.1).  Nor is there any basis for finding that

25 Sonju's husband was murdered and that the implication from Juror No. 12's

26 comments was that Sonju was responsible for it.  (<u>See</u> Pet. at 5.3, 5.3 at n.2).  While

27 Juror No. 12 alluded to a "problem" - perhaps a money-related issue - Sonju "might

28 have caused" 20 years ago, there is no evidence that Juror No. 12's impartiality was

called into question.  It was established during the side-bar hearing that the extent of Juror No. 12's contact with Sonju was as a tenant in a trailer park nearly 20 years prior and having spent the night at her home one night in the same time frame.  She did not even recognize Sonju in person.  Further, the trial court expressly found that Juror No. 12 could independently review the evidence and not be prejudicial to either party.  Again, petitioner has not even purported to meet his burden of adducing clear and convincing evidence to rebut the presumed correctness of this finding.

**B.**   **Habeas relief is not warranted with respect to petitioner's second ground for relief.**

1.   The record below

Prior to voir dire, defense counsel sought guidance from the trial court on the admissibility of certain gang evidence so that she could effectively voir dire prospective jurors.  The trial court summarized what it believed to be the People's theory: the shooting of the victim, Hill Bey, was in retaliation for the confrontation that occurred on September 7th, and that the retaliation was gang motivated "in that he [Hill Bey] didn't show the proper respect to the gang members when he confronted them based upon an altercation occurring between the alleged gang members and his daughter."  In the trial court's view, the evidence would show that Hill Bey's daughter had gotten into a confrontation with individuals she knew to be gang members and that she had called her (step) father on the cell phone, indicating that she knew one of the gang members to be "Reg" or "Reggie."  There was no evidence petitioner in fact was present at the time that Hill Bey confronted the individuals, but there was evidence others he believed to be gang members were present.  Several days later (September 19th), Hill Bey was assisting his daughter in moving, had contact with some unidentified person, and later attempted to leave the complex.  While he was trying to leave through the monitored gate, he was shot, saw the person he believed

1   to be the assailant, and sped off to seek medical treatment.  (See 1 RT 52-53).

2   The trial court indicated that the only issue it was addressing was whether the

3   prosecutor could solicit information with respect to petitioner's gang affiliation (both

4   from Larisha Hunter in the form of lay opinion and from the detective in the form of

5   expert opinion), and through the detective, the issue of the "disrespect factor" within

6   the gang context.  The trial court found that gang affiliation and gang retaliation were

7   relevant.  As to the issue of whether the evidence was more prejudicial than probative,

8   the trial court found that the evidence was probative because it established motive by

9   showing that the shooting was not "out of the blue" but was planned and in retaliation

10  for the confrontation the victim had with the gang members, and the evidence also had

11  a tendency to prove identification.  As to prejudice, because it was not relevant to

12  prove an element of an offense or enhancement, a "red flag" did go up.  However, in

13  the right factual scenario, under California case law, it might be relevant to prove

14  identification and motive.  (See 1 RT 54-56).  Defense counsel argued that the fact

15  that someone might be a gang member did not in any way prove identification and that

16  the prejudice outweighed the probative value of the evidence.[5]  The trial court noted

17  that there was evidence that petitioner recognized the area as claimed by particular

18  gang members, that gang members were present during Hunter's encounter with

19  petitioner, and that petitioner was an admitted member of the Park Village Crips and

20  found that the jury could look to these factors to determine whether petitioner was a

21  gang member, whether the shooting was retaliatory, and whether it was petitioner who

22  did the shooting.  Here, the trial court found, this evidence showed who the shooter

23  might have been and the reason the shooting might have occurred.  (See 1 RT 57-58).

24  The trial court ruled that the prosecutor could elicit information from Larisha Hunter

25  with respect to her knowledge of the individuals who were present and their

26

27          [5]      Petitioner's counsel made no specific argument regarding the

28  admissibility of petitioner's conduct of pointing a gun at Hunter and her boyfriend.

association with any gang and the fact that she contacted her (step) father during the encounter and indicated the name of one individual.[6]  (See 1 RT 60-61).

At trial, Hunter testified about her encounter with petitioner and his friends at the apartment complex prior to the shooting of her step-father.  She testified that she drove into the complex to find her designated parking spot occupied.  She yelled into a crowd of people, inquiring whose car was parked in her spot.  When a woman yelled back it was her car, Hunter asked her to move it.  The woman complied.  Petitioner approached Hunter, advising her that "next time, know who you're talking to before you say something."  Hunter told petitioner to leave the situation alone, and petitioner said they would just "take it out on [her] boyfriend."  Hunter was concerned that the situation would escalate and called her mother, who in turn woke up Hunter's step-father to advise him of the situation.  (See 1 RT 317-19, 328-29).  When Hunter would not tell petitioner whom she had called after he repeatedly asked, petitioner threw his cup of alcohol on her car, and Hunter's boyfriend went to retrieve his (steering wheel locking) club out of the car.  Petitioner pulled a gun out of the car that had just been moved, cocked the gun, and pointed it at Hunter and her boyfriend.  Petitioner said she did not know who he was, identified himself as Park Village Crips, threatened to "wet [her] up," and was "claiming the neighborhood" as Park Village Crips'.  Hunter pleaded for everyone to calm down because her infant son was in the car.  Petitioner ultimately got in the car and left.  (See 1 RT 319-23, 329-31, 333, 335-36).

Hunter testified that when her father arrived at the complex with a gun, she told him what had occurred and that it was "Reggie" (petitioner) with whom she had had the conflict.  Hill Bey did not remember petitioner, whom Hunter described as "Little Reggie," (someone she had known for a long time) but he began looking for him,

---

[6]      The trial court also ruled on the admissibility of the gang expert's testimony after hearing argument, but as neither the argument nor ruling in this regard is relevant to this claim, the Court has not summarized either here.

yelling out for him.  Hunter testified that Hill Bey yelled out that if they want to get something started, they could, but to "fuck" with him instead of his family.  He yelled out loud to the guys who were outside, "Well, you let whoever this guy is know that I'm looking for him."  (See 1 RT 336, 343, 347-48).

### 2.   Petitioner's claim

Petitioner contends that the trial court deprived him of his Fourteenth Amendment right to a fair trial when it admitted evidence of petitioner's "prior bad act" (i.e., "the entire event that occurred on September 7, 2003") because this evidence was irrelevant to the crime for which petitioner was on trial.  (See Pet. at 5, 5.6-5.10). He maintains that this evidence was cumulative of the gang expert's testimony and did not establish motive or identity because there was no evidence that petitioner knew Hill Bey or even was aware of the challenge Hill Bey had issued on September 7th to petitioner.  (See Pet. at 5.7).  Citing California law, he maintains that the prosecution may not admit evidence to prove that the defendant had a disposition to commit the crime charged.  (See Pet. at 5.9).

### 3.   Applicable legal authority

As a general proposition, federal habeas courts "do not review questions of state evidence law."  See Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991). Federal habeas relief only is available if the petitioner is contending that he is in custody in violation of the Constitution or laws or treaties of the United States.  See 28 U.S.C. § 2254(a); see also McGuire, 502 U.S. at 67-68 ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); Phillips, 455 U.S. at 221 ("A federally issued writ of habeas corpus, of course, reaches only convictions obtained in violation of some provision of the United States Constitution.").

"Habeas relief is available for wrongly admitted evidence only when the

24

1  questioned evidence renders the trial so fundamentally unfair as to violate federal due

2  process." Jeffries v. Blodgett, 5 F.3d 1180, 1193 (9th Cir. 1993), cert. denied, 510

3  U.S. 1191 (1994); see also Windham v. Merkle, 163 F.3d 1092, 1103 (9th Cir. 1998);

4  Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995).   "Only if there are no

5  permissible inferences the jury can draw from the evidence can its admission violate

6  due process." Jammal, 926 F.2d at 920; McKinney v. Rees, 993 F.2d 1378, 1384 (9th

7  Cir.), cert. denied, 510 U.S. 1020 (1993); see also McGuire, 502 U.S. at 70 (where the

8  challenged evidence is relevant to an issue in the case, its admission cannot be said to

9  have violated the defendant's due process rights).

10

11        4.   Analysis

12        To the extent petitioner is claiming that the trial court violated California's

13  evidentiary rules (i.e., Cal. Penal Code §§ 1101-1103) in admitting this evidence, his

14  claim is not cognizable on federal habeas review.  See 28 U.S.C. § 2254(a); McGuire,

15  502 U.S. at 67-68; Smith v. Phillips, 455 U.S. at 221.

16        To the extent petitioner is alleging a due process violation based on the

17  admission of this "irrelevant" prior bad acts evidence, habeas relief is not warranted.

18  The Court concurs with the trial court that the evidence of Hunter's encounter with

19  petitioner on September 7th and his gang membership was relevant to establish

20  identity and motive.  With respect to identity, Hunter recognized petitioner as the man

21  who pointed the gun at her and she told Hill Bey so.  Although Hill Bey did not even

22  remember petitioner at the time of Hunter's encounter with him, after he was shot, his

23  description of the shooter to Hunter was consistent with petitioner's physique.  Later,

24  without any input from Hunter, Hill Bey, who was a skilled illustrator, drew a picture

25  of the shooter.  Hunter recognized petitioner as the person in the drawing.  (See 1 RT

26  352-54).  With respect to motive, as the trial court observed, the theory of the case was

27  that petitioner had shot Hill Bey in retaliation for the challenge he issued to petitioner

28  through his fellow gang members following his apparent assault on Hunter.  Hunter's

25

testimony was not cumulative of the gang expert's testimony -- the gang expert's testimony served to explain why a gang member would have shot Hill Bey following the challenge Hill Bey issued to petitioner through his fellow gang members, while Hunter's testimony laid the evidentiary foundation for the theory that the shooting was a gang related retaliation – i.e., petitioner's motive for shooting Hill Bey. Regarding petitioner's contention that there was no evidence he was aware of the threat, the gang expert testified that members of the Park Village Crip gang predominantly claimed the Park Village Apartment Complex as their territory, and that petitioner was an admitted Park Village Crips gang member. Thus, the jury could reasonably have inferred that sometime during the twelve days between Hunter's encounter with petitioner and the shooting, petitioner had learned of the challenge. Because the encounter on September 7th was relevant to an issue in the case, its admission did not violate petitioner's due process rights. See McGuire, 502 U.S. at 70; see also Jammal, 926 F.2d at 920 ("Only if there are no permissible inferences the jury can draw from the evidence can its admission violate due process."); McKinney, 993 F.2d at 1384.

Finally, to the extent petitioner is alleging a violation of his federal constitutional due process right to a fair trial based on the admission of the prior bad acts evidence as propensity evidence, the Court notes that the Supreme Court explicitly left open in Estelle v. McGuire the question of whether the admission of evidence of other crimes solely to prove propensity violates due process. See 502 U.S. at 75 n.5 ("[W]e express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime"); see also Alberni v. McDaniel, 458 F.3d 860, 866-67 (9th Cir. 2006) (declining to declare a constitutional principle relating to the propriety of admitting propensity evidence clearly established where the Supreme Court "had expressly concluded the issue was an 'open question'"), cert. denied, 127 S. Ct. 1834 (2007). Since petitioner is unable to point to any United States Supreme Court case holding that the admission of prior bad acts evidence violates a criminal defendant's

26

federal constitutional due process right to a fair trial, it cannot be said that the California courts' rejection of this claim either was contrary to or involved an unreasonable application of clearly established Supreme Court law. See Musladin, 127 S. Ct. at 654 ("Given the lack of holdings from this Court regarding" the claim, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" (alterations in original)); Brewer v. Hall, 378 F.3d 952, 955 (9th Cir. 2004) ("If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law."); see also Hassinger v. Adams, 2007 WL 2095340, at *1 (9th Cir. July 23, 2007) (use of propensity evidence did not violate clearly established Federal law since the Supreme Court has explicitly reserved the question of whether the use of propensity evidence violated due process) (now citable for its persuasive value pursuant to Ninth Circuit Rule 36-3).

**C.   Habeas relief is not warranted with respect to petitioner's third ground for relief.**

    1.   Petitioner's ineffective assistance of counsel claim

        a.   The record below

Immediately prior to the start of the preliminary hearing in petitioner's case on January 16, 2004, petitioner's counsel (who was a Public Defender) made a motion for a live line-up pursuant to petitioner's request. The trial court denied the motion as untimely. (See CT 1). After the preliminary hearing had begun, counsel advised the trial court that petitioner was requesting a motion to substitute counsel pursuant to People v. Marsden, 2 Cal. 3d 118, 84 Cal. Rptr. 156, 465 P.2d 44 (1970). Counsel indicated that he did not know if the judge wanted "to handle it before, middle, after." The trial court responded that it would not interrupt the preliminary hearing for that purpose but would hear the motion if counsel brought it up at a later date. The trial

1  court observed, "That's something you should have brought up," to which petitioner
2  responded, "I told him already." (See 1 CT 5).  At the conclusion of the preliminary
3  hearing, petitioner was held to answer. (See 1 CT 28-29).

4      It appears from the printout of minute orders included in Lodgment No. 7 that
5  a Marsden motion was heard and denied the morning of March 16, 2004.  At the same
6  hearing, petitioner's counsel's request to withdraw due to a conflict also was denied.
7  However, at a hearing that afternoon, after petitioner's counsel declared a conflict, the
8  trial court appointed the Alternate Public Defender's Office to represent petitioner.
9  And, when petitioner went to trial approximately two months later on May 17, 2004,
10 he was represented by an attorney from the Alternate Public Defender's Office. (See
11 Lodgment No. 7).

12     Petitioner's third ground for relief is not directed to the quality of the
13 representation he received from his trial counsel.  Rather, as best the Court can glean
14 from petitioner's allegations, he is contending that his counsel at the preliminary
15 hearing was ineffective for (1) failing to inform the court that petitioner was
16 requesting a Marsden hearing at the start of the preliminary hearing (when petitioner
17 first conveyed his request to counsel), and (2) failing to request a timely live line-up,
18 which according to petitioner in turn "permitted petitioner to be found guilty based on
19 Identification [sic] testimony that was the product of a suggestive[,] tainted[,] and
20 unreliable identification procedure." (See Pet. at 6.5).

21
22          b.    Applicable legal authority
23     In Strickland v. Washington, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d
24 674 (1984), the Supreme Court held that there are two components to an ineffective
25 assistance of counsel claim: "deficient performance" and "prejudice."

26     "Deficient performance" in this context means unreasonable representation
27 falling below professional norms prevailing at the time of trial. See id. at 688-89.  To
28 show "deficient performance," petitioner must overcome a "strong presumption" that

28

1  his lawyer "rendered adequate assistance and made all significant decisions in the

2  exercise of reasonable professional judgment." Id. at 690.  Further, petitioner "must

3  identify the acts or omissions of counsel that are alleged not to have been the result

4  of reasonable professional judgment." Id.  The Court must then "determine whether,

5  in light of all the circumstances, the identified acts or omissions were outside the

6  range of professionally competent assistance." Id.  The Supreme Court in Strickland

7  recognized that "it is all too easy for a court, examining counsel's defense after it has

8  proved unsuccessful, to conclude that a particular act or omission of counsel was

9  unreasonable." Id. at 689.  Accordingly, to overturn the strong presumption of

10  adequate assistance, petitioner must demonstrate that "the challenged action cannot

11  reasonably be considered sound trial strategy under the circumstances of the case."

12  Lord v. Wood, 184 F.3d 1083, 1085 (9th Cir. 1999), cert. denied, 528 U.S. 1198

13  (2000).

14      To meet his burden of showing the distinctive kind of "prejudice" required by

15  Strickland, petitioner must affirmatively "show that there is a reasonable probability

16  that, but for counsel's unprofessional errors, the result of the proceeding would have

17  been different.  A reasonable probability is a probability sufficient to undermine

18  confidence in the outcome." Strickland, 466 U.S. at 694.  See also Lockhart v.

19  Fretwell, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993) (noting that the

20  "prejudice" component "focuses on the question whether counsel's deficient

21  performance renders the result of the trial unreliable or the proceeding fundamentally

22  unfair").

23

24          c.    Analysis

25      With respect to petitioner's claim that his counsel was ineffective for failing to

26  inform the court that petitioner was requesting a Marsden hearing at the start of the

27  preliminary hearing (when petitioner first conveyed his request to counsel), the Court

28  finds that petitioner has not made the requisite showing that, but for counsel's failure,

29

1    there is a reasonable probability that the outcome of the trial would have been

2    different.  As noted above, petitioner's counsel was relieved from the representation

3    approximately two months in advance of the commencement of the trial and petitioner

4    was represented by new counsel at the trial.  Petitioner's failure to make the requisite

5    showing of prejudice renders it unnecessary to address the deficient performance

6    issue.  See Strickland, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness

7    claim on the ground of lack of sufficient prejudice, ... that course should be

8    followed."); see also Rios v. Rocha, 299 F.3d 796, 805 (9th Cir. 2002); Williams v.

9    Calderon, 52 F.3d 1465, 1470 n.3 (9th Cir. 1995), cert. denied, 516 U.S. 1124 (1996).

10         With respect to petitioner's claim that his counsel was ineffective for failing to

11   request a live line-up, petitioner concedes that his counsel did not think a motion for

12   a live line-up would be granted in light of Hill Bey's identification of petitioner from

13   a six-pack photographic line-up.  (See Pet. at 6.1).  In fact, under California law, "[t]he

14   right to a lineup arises . . . only when eyewitness identification is shown to be a

15   material issue and there exists a reasonable likelihood of a mistaken identification

16   which a lineup would tend to resolve."  People v. Underwood, 139 Cal. App. 3d 906,

17   913, 189 Cal. Rptr. 105 (1983) (citation omitted).  While identification arguably was

18   a material issue here, the Court finds that petitioner's counsel reasonably could have

19   believed that he could not make the showing that there existed a reasonable likelihood

20   of mistaken identification that a line-up would tend to resolve since Hill Bey, a skilled

21   illustrator, had drawn a sketch of the shooter, whom Hunter had identified as

22   petitioner, and Hill Bey also had identified petitioner from a photographic line-up.

23   Thus, put another way, petitioner's counsel reasonably could have believed under the

24   circumstances that a motion for a live line-up would be futile.  The failure to make a

25   futile motion does not constitute ineffective assistance of counsel.  See e.g., James v.

26   Borg, 24 F.3d 20, 27 (9th Cir.), cert. denied, 513 U.S. 935 (1994); Morrison v. Estelle,

27   981 F.2d 425, 429 (9th Cir. 1992), cert. denied, 508 U.S. 920 (1993).

28         Accordingly, the Court finds and concludes that the California courts' rejection

1   of petitioner's ineffective assistance of counsel claim neither was contrary to nor

2   involved an unreasonable application of <u>Strickland</u>.

3

4        2.    <u>Petitioner's claim relating to the Marsden motion made during the</u>

5              <u>preliminary hearing</u>

6        Petitioner contends that he was denied due process and the right to the effective

7   assistance of counsel when the trial court did not conduct a hearing on the <u>Marsden</u>

8   motion he made during the preliminary hearing.  (<u>See</u> Pet. at 6.1-6.4).

9

10            a.    <u>Applicable legal authority</u>

11       "[I]t is well established and clear that the Sixth Amendment requires on the

12  record an appropriate inquiry into the grounds for such a motion, and that the matter

13  be resolved on the merits before the case goes forward.  Given the commands of Sixth

14  Amendment jurisprudence, a state trial court has no discretion to ignore an indigent

15  defendant's timely motion to relieve an appointed attorney."  <u>Schell v. Witek</u>, 218

16  F.3d 1017, 1025 (9th Cir. 2000) (en banc) (internal citations omitted).  Likewise, "the

17  state trial court's summary denial of a defendant's motion for new counsel without

18  further inquiry violate[s] the Sixth Amendment."  <u>Hudson v. Rushen</u>, 686 F.2d 826,

19  829 (9th Cir. 1982) (internal citations omitted), <u>cert. denied</u>, 461 U.S. 916 (1983).

20       Where the state court fails to inquire into a defendant's motion for substitute

21  counsel, "the basic question is simply whether the conflict between the defendant and

22  his attorney prevented effective assistance of counsel."  <u>Schell</u>, 218 F.3d at 1026.  In

23  other words, "the ultimate constitutional question the federal courts must answer . .

24  . [is] whether th[e] error actually violated [the defendant's] constitutional rights in that

25  the conflict between [the defendant] and his attorney had become so great that it

26  resulted in a total lack of communication or other significant impediment that resulted

27  in turn in an attorney-client relationship that fell short of that required by the Sixth

28  Amendment."  <u>See</u> <u>id.</u>  Not every conflict or disagreement between the defendant and

31

1   counsel implicates the Sixth Amendment.  See Morris v. Slappy, 461 U.S. 1, 13, 14,

2   103 S. Ct. 1610, 75 L. Ed. 2d 610 (1983); Daniels v. Woodford, 428 F.3d 1181, 1196

3   (9th Cir. 2005), cert. denied, 127 S. Ct. 2876 (2007).  Thus, "[i]t may be the case, for

4   example, that because the conflict was of [the defendant's] own making, or arose over

5   decisions that are committed to the judgment of the attorney and not the client, in fact

6   [the defendant] actually received what the Sixth Amendment required in the case of

7   an indigent defendant, notwithstanding the State trial court's failure to inquire."

8   Schell, 218 F.3d at 1026.

9

10                  b.    Analysis

11         The record reflects that the trial court did not summarily deny or ignore

12   petitioner's Marsden motion, but rather instructed petitioner to bring it up after the

13   preliminary hearing.  Subsequent to the preliminary hearing, petitioner did make a

14   Marsden motion that was heard and denied.  The issue of petitioner's entitlement to

15   substitute counsel then became moot when new counsel was appointed for trial.

16         Moreover, the gravamen of petitioner's claim relating to the Marsden motion

17   made during the preliminary hearing is not that he was constructively denied counsel

18   at the preliminary hearing or that there had been an irreparable breakdown in

19   communication with his attorney, but rather that petitioner did not believe his counsel

20   was representing him effectively. Petitioner's complaints against his counsel stemmed

21   from his disagreements with him over strategic decisions.   Such complaints are

22   insufficient to establish that there was a conflict between petitioner and his counsel

23   that had resulted in a total breakdown in communication and that was sufficiently

24   serious to amount to the constructive denial of counsel at the preliminary hearing. See

25   Schell, 218 F.3d at 1026 n.8 (quoting Brookhart v. Janis, 384 U.S. 1, 8, 86 S. Ct.

26   1245, 16 L. Ed. 2d 314 (1966) (Harlan, J., dissenting in part)) ("'[A] lawyer may

27   properly make a tactical determination of how to run a trial even in the face of his

28   client's incomprehension or even explicit disapproval.'")); United States v. Smith, 282

F.3d 758, 763 (9th Cir. 2002) (affirming district court's denial of motion for substitute counsel based, in part, on fact that the disagreement between defendant and counsel was about "strategic purposes").  The Court therefore finds that petitioner "received what the Sixth Amendment required in the case of an indigent defendant, notwithstanding the State trial court's failure to inquire" during the preliminary hearing.  See Schell, 218 F.3d at 1026.

Accordingly, the Court finds and concludes that the California courts' rejection of this claim neither was contrary to nor involved an unreasonable application of clearly established Supreme Court law.

**D.     Habeas relief is not warranted with respect to petitioner's fourth ground for relief.**

As best the Court can glean from petitioner's allegations, the gravamen of petitioner's fourth ground for relief is that he did not receive the appellate representation to which he was constitutionally entitled when his appellate counsel failed to raise Grounds One, Two, and Three to the California Court of Appeal. (See Pet. at 6.6-6.13).

The Strickland standard also applies to claims of ineffective assistance of appellate counsel based on the failure of appellate counsel to raise particular claims on appeal.  See Smith v. Robbins, 528 U.S. 259, 285, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000).  A habeas petitioner must show that, but for appellate counsel's objectively unreasonable failure to raise the omitted claim(s), there is a reasonable probability that petitioner would have prevailed on appeal.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.  In the absence of such a showing, neither Strickland prong is satisfied. See Pollard v. White, 119 F.3d 1430, 1435-37 (9th Cir. 1997); Miller v. Keeney, 882 F.2d 1428, 1434-35 (9th Cir. 1989).

Here, it follows from the Court's rejection above of the claims alleged by

1    petitioner in Grounds One, Two, and Three that petitioner has failed to meet his

2    burden of showing that, but for appellate counsel's failure to raise those claims, there

3    is a reasonable probability that petitioner would have prevailed on appeal.[7]  Further,

4    to the extent that petitioner is claiming that his appellate counsel had a duty to file a

5    habeas petition on his behalf concurrently with or before filing the opening brief on

6    appeal (see Pet. at 6.11-6.12), the Court notes that there is no constitutional right to

7    counsel for the purpose of filing a state habeas petition.  See Pennsylvania v. Finley,

8    481 U.S. 551, 556-57, 107 S. Ct. 1990, 95 L. Ed. 2d 539 (1987).  And where no

9    constitutional right to counsel exists, there can be no claim for ineffective assistance.

10   See Wainwright v. Torna, 455 U.S. 586, 587-88, 102 S. Ct. 1300, 71 L. Ed. 2d 475

11   (1982); Miller v. Keeney, 882 F.2d 1428, 1432 (9th Cir. 1989) ("If a state is not

12   constitutionally required to provide a lawyer, the constitution cannot place any

13   constraints on that lawyer's performance."); see also Sanchez v. United States, 50

14   F.3d 1448, 1456 (9th Cir. 1995) ("there is no constitutional right to counsel at a

15   collateral, post-conviction section 2255 proceeding" and "[w]ithout such a right,

16   [petitioner] cannot assert a claim for ineffective assistance of counsel").

17        The Court therefore finds and concludes that the state courts' rejection of

18   petitioner's claim relating to the quality of the representation that he received from

19   appellate counsel neither was contrary to nor involved an unreasonable application of

20   clearly established Supreme Court law.

21

22                            **RECOMMENDATION**

23        IT THEREFORE IS RECOMMENDED that the District Court issue an Order:

24   _____

25        [7]    The Court's conclusion that petitioner was not denied the effective

26   assistance of appellate counsel is dispositive of his contention that his right to equal

27   protection was violated by the appointment of incompetent counsel on appeal when,

     had he not been indigent, he would have been able to retain competent appellate

28   counsel.  (See Pet. 6.8-6.9).

                                    34

1  (1) approving and adopting this Report and Recommendation; and (2) directing that

2  Judgment be entered denying the Petition and dismissing this action with prejudice.

3

4  DATED: July 16, 2008

5

6  _____

7  ROBERT N. BLOCK
   UNITED STATES MAGISTRATE JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

35